STATE OF MINNESOTA

IN SUPREME COURT

A22-1236

Court of Appeals                                              Thissen, J.
                                          Took no part, Hennesy, Gaïtas, JJ.

Minor Doe 601, a minor, by and through
his mother and natural guardian,
Mother Doe 601,

                                    Appellants,

vs.                                                    Filed: February 26, 2025
                                                   Office of Appellate Courts
Best Academy, a/k/a and d/b/a
Harvest Best Academy, et al.,

                                    Respondents,

Aaron James Hjermstad, et al.,

                                    Defendants.

_____

Wilbur W. Fluegel, Fluegel Law Office, Minneapolis, Minnesota; and

Jeffrey R. Anderson, Michael G. Finnegan, Molly K. Burke, Joshua D. Peck, Jeff Anderson & Associates, P.A., Saint Paul, Minnesota, for appellants.

Christian R. Shafer, Timothy A. Sullivan, Ratwick, Roszak & Maloney, P.A., Saint Paul, Minnesota, for respondents.

Jason L. DePauw, Keller Postman LLC, Chicago, Illinois, for amicus curiae Minnesota Association for Justice.

Kenneth H. Bayliss, Dyan J. Ebert, Elle M. Lannon, Quinlivan & Hughes, P.A., Saint Cloud, Minnesota, for amicus curiae Minnesota Defense Lawyers Association.

_____

S Y L L A B U S

1.     A municipality's activity broadly labeled as a "hiring decision" is not categorically and necessarily a policy-level decision involving weighing competing economic, social, political, and financial considerations for purposes of the discretionary-function exception to municipal tort liability under Minnesota Statutes section 466.03, subdivision 6 (2024).

2.     On summary judgment, the circumstances surrounding the respondent school's decision to hire defendant as a teacher do not support the inference, without actual evidence, that respondent's conduct in failing to investigate defendant's background was conduct involving balancing competing economic, social, political, and financial considerations for purposes of the discretionary-function exception to municipal tort liability.

Reversed and remanded.

O P I N I O N

THISSEN, Justice.

Appellant Minor Doe 601 (Minor Doe), by and through his mother and natural guardian, Mother Doe 601 (Mother Doe), brought several tort claims against multiple parties—including a claim for negligent hiring against respondent Best Academy—after

his teacher, defendant Aaron Hjermstad, sexually assaulted him.[1]  Best Academy sought summary judgment on Minor Doe's claim under the discretionary-function exception to municipal tort liability set forth in Minn. Stat. § 466.03, subd. 6 (2024).[2]  To invoke the discretionary-function exception, a municipality bears the burden of proving that the conduct challenged in the lawsuit involved weighing competing social, political, economic, or financial considerations.[3]  *Waste Recovery Coop. of Minn. v. Hennepin County*, 517 N.W.2d 329, 332 (Minn. 1994).

The district court granted summary judgment in favor of Best Academy, reasoning that a municipality's decision to hire an employee is always a planning-level policy decision shielded from tort liability—even absent any evidence that the municipality

---

[1]     Mastery School was also named in the suit and is a respondent here.  During the events at issue, Best Academy and Mastery School were two charter schools that had separate boards of directors.  Administrators and staff, however, moved fluidly between them.  Both schools contracted with respondent Harvest Network of Schools to handle certain administrative and human resources functions.  On July 1, 2021, Mastery School merged with Best Academy; Mastery School no longer exists.  For ease of reading, we refer to the respondents, collectively, as Best Academy unless the context requires otherwise.

[2]     We have alternatively referred to immunity under section 466.03, subdivision 6, as "statutory immunity," "discretionary immunity," "discretionary function immunity" and the "discretionary-function exception."  In fact, subdivision 6 is an exception to the general rule that a municipality is subject to liability for the torts that the municipality commits.  We will refer to subdivision 6 as the discretionary-function exception to municipal tort liability or the discretionary-function exception as shorthand.

[3]     Charter schools like Best Academy and Mastery School are designated school districts "for the purposes of tort liability under chapter 466."  Minn. Stat. § 124E.03, subd. 2(d) (2024).   Minnesota Statutes chapter 466 provides that school districts are municipalities immune from any claim based on "a discretionary function or duty."  Minn. Stat. § 466.03, subd. 6.

weighed competing policy considerations in making the decision. The court of appeals affirmed applying the same reasoning.

For the reasons below, we disagree with the rule applied by the district court and the court of appeals. We further conclude that, applying the proper rule, Best Academy did not meet its burden for purposes of prevailing on its summary judgment motion. Accordingly, we reverse the decision of the court of appeals and remand this case to the district court.

## FACTS[4]

From 2016 to 2020, Mastery School (Mastery), a charter school located in Minneapolis, employed Hjermstad as a licensed physical education teacher. Hjermstad also served as a basketball coach for the joint charter school basketball program including students from Mastery and respondent Best Academy, another Minneapolis charter school. Prior to teaching at Mastery, Hjermstad was a physical education teacher and athletic director at Excell Academy Charter School (Excell), located in Brooklyn Park, from 2001

---

[4] The facts cited here come primarily from evidence in the record and not from a factfinder. At the summary judgment stage in the proceedings, we must view the evidence presented "in the light most favorable to the nonmoving party" and "resolve all doubts and factual inferences against the moving parties." *Rochester City Lines, Co. v. City of Rochester*, 868 N.W.2d 655, 661 (Minn. 2015). Summary judgment is inappropriate when reasonable persons viewing the evidence presented could draw differing conclusions. *Osborne v. Twin Town Bowl, Inc.*, 749 N.W.2d 367, 371 (Minn. 2008).

until 2015. He was also a volunteer basketball and baseball coach at Hospitality House, a Minneapolis youth development program, from 1998 until 2020.

Minor Doe attended Best Academy for fifth through eighth grades, from 2016 to 2020. During his fifth- and sixth-grade years, Minor Doe played basketball on the joint Best Academy-Mastery team that Hjermstad coached.

### *The 2015 Accusation and Subsequent Investigations*

In May 2015, when Hjermstad was employed at Excell, a 12-year-old student reported that Hjermstad had sexually abused him on three occasions, including at least once when he and several other students were sleeping over at Hjermstad's house. Excell had previously told Hjermstad that he was not allowed to have students sleep at his house. Excell administrators reported the allegation to law enforcement, which initiated a criminal investigation. In addition, a maltreatment report was filed with the Minnesota Department of Education which also investigated.

The criminal investigation discovered the identities of four other children who were present at Hjermstad's home on the night of one of the alleged assaults. One child's parents did not allow the child to participate in an interview and the other three could not corroborate the events reported. In a formal report, the Minnesota Department of Education recognized that the witnesses may have had information but might have declined to cooperate "because of cultural taboos against homosexual contact in their culture." The Hennepin County Attorney's Office decided not to charge Hjermstad with any crime related to the 2015 allegations. The Minnesota Department of Education investigator

5

subsequently concluded that there was insufficient proof to establish, by a preponderance of the evidence, that Hjermstad abused the Excell student.

While the criminal investigation was pending, Hospitality House—where Hjermstad worked as a volunteer coach—placed him on a leave of absence and directed him to have no contact with Hospitality House athletes. Hospitality House conducted its own investigation, interviewing players and other coaches about Hjermstad. During the interviews, a number of Hospitality House coaches spoke in support of reinstating him.

At the recommendation of its executive committee, the Hospitality House Board of Directors unanimously voted to formally reinstate Hjermstad as a volunteer in November 2015. Hjermstad's reinstatement, however, was subject to conditions, including that Hospitality House children could not stay overnight at Hjermstad's residence and Hjermstad could not drive Hospitality House players without another adult present in the vehicle.

Excell, however, notified Hjermstad that it would not renew his at-will employment contract for the 2015–16 school year. It did not provide an explicit reason for the decision. Hjermstad subsequently applied, and was hired, for a teaching position at Mastery. Mastery's hiring process is the subject of Minor Doe's negligent hiring claim.

***Mastery's Hiring Process***

Both Best Academy and Mastery contracted with a non-profit charter management entity, Harvest Network of Schools (the Network), to manage their hiring process. The Network divided this process between two internal departments. The Network's Human Capital Department was responsible for recruiting applicants, processing applications, and

6

collecting resumes and cover letters.  The Human Capital Department also screened applicants by evaluating their aptitude, scheduling interviews, and drafting interview questions.

The Network's Human Resources Department then passed along applications and resumes to principals at each school with open positions to set up interviews.  If, after an interview, a principal wanted to hire a candidate, the principal filled out a request-to-hire form—a checklist for the hiring process—and submitted it to the Human Resources Department, along with the candidate's resume and notes from the interview.  The Human Resources Department was responsible for creating an employee's file with the application, resume, and request-to-hire form.  The Human Resources Department also handled employment verification and drafted offer letters for the selected candidates.  In addition, it would conduct criminal background and teaching licensure checks as required by statute. *See* Minn. Stat. § 123B.03, subds. 1, 1a (2024).

Candidates were required to provide three reference letters as part of the hiring process.  If the Network received the reference letters prior to a candidate's interview, it provided them to the principal.  Otherwise, the principal did not receive the letters.  The request-to-hire form (the checklist the principal provided to the Department of Human Resources after an interview) included three spaces to fill in the dates that the candidates' three references were called.  In practice, however, principals did not call references.  That was left to the Network's Human Resources Department.  Further, there were periods when

7

the Network's Human Resources Department chose not to contact any references.[5]  The hiring process did not require calls to former employers.

### *Mastery Hired Hjermstad*

Mastery Principal Pamela Bump interviewed Hjermstad on June 27, 2016.  During the interview, Bump asked Hjermstad why he had left Excell.  Hjermstad told her that his contract was not renewed due to budget cuts.  Bump explained that she determined Hjermstad would be a good fit for an open physical education position due to the significant amount of time he had spent as a teacher in North Minneapolis and its northern suburbs, his experience volunteering and coaching, and his charter school experience, including experience as a charter school board member.

Bump signed a request-to-hire form on June 30 and submitted it to the Human Resources Department.  The following day, a letter was emailed to Hjermstad offering him employment as a physical education teacher for the 2016–17 school year to begin on July 11.  Hjermstad accepted and signed the offer letter.

A school administrator emailed Hjermstad on July 6.  He congratulated Hjermstad on joining the Mastery faculty and provided directions for completing employment paperwork, including (1) a job application, (2) a background check form, (3) transcripts, and (4) the three necessary reference letters.  On July 7, Hjermstad signed his employment

---

[5]     The record is inconsistent on this issue.  The principal who hired Hjermstad, Pamela Bump, understood that the employment screening and hiring process—including the requirement that references be called—was mandatory and that she had no discretion to depart from it.  But Shana Ford, the Chief of Administration and Human Capital at the Network, stated that there was a time when references were contacted, but the practice eventually stopped.

application and emailed it to the administrator, along with his transcripts, a list of references (but no letters), and authorization for a criminal background check. On his job application, Hjermstad did not answer two questions: (1) the reason for leaving Excell, and (2) whether the school could contact Excell. Hjermstad also asked whether the reference letters were really necessary; there is no information in the record that Mastery ever responded to his inquiry or that Hjermstad ever provided reference letters.

Hjermstad did not include any supervisors in his list of references. Rather, he listed two fellow volunteer coaches from Hospitality House and one former school-wide paraprofessional from Excell. The Hospitality House coaches were aware of the 2015 accusation against Hjermstad and had been questioned during Hospitality House's investigation.[6] Neither Hospitality House nor Excell was contacted before Hjermstad was hired.

### *Hjermstad Abused Minor Doe*

Shortly after Mastery hired Hjermstad, he began coaching Best Academy and Mastery's joint fifth–sixth grade basketball team.[7] Hjermstad would host basketball players at his home for sleepovers. At least one other coach knew about the sleepovers.

---

[6] During the Hospitality House investigation, the coaches had come to Hjermstad's defense because they did not believe the accuser and thought very highly of Hjermstad.

[7] There is no evidence in the record that Best Academy or Mastery conducted any additional hiring or screening processes for Hjermstad before he began his coaching position.

Minor Doe stayed overnight at Hjermstad's house 4–5 times after basketball activities and once after attending a Fourth of July parade. Each time, other children were present.

The night Hjermstad sexually abused Minor Doe, he was one of four children who went to Hjermstad's house to sleep over. Minor Doe testified that after playing basketball Hjermstad drove him from Mastery to Hjermstad's house. Late that night, when Minor Doe was sleeping in Hjermstad's bedroom, Hjermstad sexually abused Minor Doe. Minor Doe did not immediately report the abuse.

### Hjermstad's Child Abuse Comes to Light

On March 5, 2020, a parent unrelated to Minor Doe reported to Mastery that Hjermstad had sexually abused her son when the child was staying overnight at Hjermstad's house prior to a basketball activity. Mastery placed Hjermstad on administrative leave and requested to interview him to investigate the incident. Hjermstad refused the interview. Mastery subsequently fired Hjermstad and reported the incident to law enforcement.

On June 12, 2020, the Star Tribune published an article reporting that Hjermstad had been charged with criminal sexual assault of a minor in connection with the incident reported in March 2020. Mother Doe showed the article to Minor Doe, who then told her that Hjermstad had sexually abused him. Hjermstad was ultimately convicted of criminal sexual conduct for his crimes against Minor Doe and three other children.

On July 2, 2020, Minor Doe, by and through his mother and natural guardian, Mother Doe, filed a complaint in the instant matter asserting five claims against multiple

defendants. Relevant to this appeal, Minor Doe claimed that Best Academy's decision to hire Hjermstad was negligent. In two separate summary judgment motions, the district court dismissed all claims against Best Academy, including the negligent hiring claim. Relying upon the court of appeals decisions in *Fear v. Independent School District* 911, 634 N.W.2d 204 (Minn. App. 2001), and *Gleason v. Metropolitan Council Transit Operations* (*Gleason I*), 563 N.W.2d 309 (Minn. App. 1997), *aff'd in part on other grounds*, 582 N.W.2d 216 (Minn. 1998), the district court concluded that municipalities are categorically and necessarily immune from litigation and liability for hiring decisions under section 466.03, subdivision 6, and that Best Academy did not need to offer any proof that its hiring decision was based on balancing policy considerations. The court of appeals affirmed under the same reasoning.[8] *Doe 601 ex rel. Doe 601 v. Best Acad.*, No. A22-1236, 2023 WL 2961825, at *5 (Minn. App. Apr. 17, 2023). We granted review.[9]

---

[8] The court of appeals stated that it was not concluding that schools are immunized from *all* hiring decisions. *Doe 601*, 2023 WL 2961825 at *5. Best Academy may provide a clue about what the court appeals meant by that statement, which seems somewhat at odds with its reasoning. Best Academy concedes that hiring decisions made contrary to statute are not subject to the discretionary-function exception to municipal tort liability. What is critical, however, is that the court of appeals relied on the legal principle that "government entities . . . [do] not need to produce evidence about their hiring decisions because their decisions to hire employees facially involved balancing policy considerations and the discretion protected by statutory discretionary immunity." *Id.* at *4. It is this legal principle that Minor Doe challenges here.

[9] In response to Minor Doe's petition for review, Best Academy filed a petition for conditional cross-review requesting that we also review whether Hjermstad's sexual assault was foreseeable. Neither the district court nor the court of appeals addressed that question in its decision, and we denied Best Academy's petition for conditional cross-review. In its brief, Best Academy also urges that we affirm the district court and court of appeals decisions dismissing Minor Doe's negligent hiring claim because Hjermstad's sexual abuse of Minor Doe was not foreseeable. We decline to reach that issue.

11

## ANALYSIS

This case presents a narrow issue of first impression: Under Minnesota Statutes section 466.03, subdivision 6, is a municipality's activity broadly labeled as a "hiring decision" categorically and necessarily a policy-level decision involving weighing competing economic, social, political, and financial considerations for purposes of the discretionary-function exception to municipal tort liability? This is a question of law which we review de novo. *Jepsen ex rel. Dean v. County of Pope*, 966 N.W.2d 472, 488 (Minn. 2021).

We conclude the answer to the question is "No." Such a presumption would sweep far too broadly and is inconsistent with the purpose of, and our case law interpreting and applying, section 466.03, subdivision 6. We further conclude that the district court and court of appeals erred in determining on summary judgment that Best Academy's conduct in making the decision to hire Hjermstad was necessarily conduct involving balancing competing economic, social, political, and financial considerations for purposes of the discretionary-function exception to municipal tort liability under section 466.03, subdivision 6.

I.

A.

We begin with background on the discretionary-function exception to municipal tort liability. At common law, sovereign immunity provided government entities a blanket defense against tort claims. In *Spanel v. Mounds View School District No. 621*, 118 N.W.2d 795, 803 (Minn. 1962), we abolished the doctrine of sovereign immunity for tort

claims against municipalities and tasked the Minnesota Legislature with defining new rules for municipal immunity. In response, the Legislature enacted the Municipal Tort Claims Act (the Act), Minn. Stat. §§ 466.01–.15 (2024).

The Act presumes that every Minnesota municipality is liable for its torts and the torts committed by its officers, employees, and agents acting within the scope of their employment. *See* Minn. Stat. § 466.02. The Act, however, also enumerates several exceptions to the general rule of liability, most of which address very particular government actions. *See generally* Minn. Stat. § 466.03.

Upon enactment, the broad tort liability the Act imposed raised a separation of powers concern, namely, that increased litigation would result in judicial interference with and second-guessing of executive and legislative responsibilities that involve resolving policy issues through the political process. *Nusbaum v. Blue Earth County*, 422 N.W.2d 713, 718 (Minn. 1988); *see generally* Michael K. Jordan, *Finding a Useful Path Through the Immunity Thicket*, Bench & Bar of Minn., Oct. 2004, at 24, 25–26. In particular, the concern was that the theory of liability underlying a tort claim (if successful) may have required a municipality to take different action in a particular situation than the action the municipality determined appropriate through exercising its legitimate legislative or executive policymaking function.[10] *See Nusbaum*, 422 N.W.2d at 718 (quoting W. Page

---

[10]  For instance, in *Nusbaum*, a tort claim alleging that a county's failure to place a new speed limit sign at the end of a reduced speed zone was negligent constituted a direct attack on a policy decision of a coequal branch of government where the policy set forth in the State Manual on Uniform Traffic Control Devices stated that the government was only required to post a sign indicating the reduced speed zone was ending. *Nusbaum*, 422 N.W.2d at 723. In contrast, a tort claim that a county's failure to place a general warning

13

Keeton et al., Prosser and Keeton on the Law of Torts § 131 at 1039 (5th ed. 1984) for the proposition that "judicial review of major executive policies for 'negligence' or 'wrongfulness' could 'disrupt the balanced separation of powers of the three branches of government' ").

To shield such policymaking functions from unwarranted judicial interference, the Legislature enacted the discretionary-function exception to government liability set forth in Minn. Stat. § 466.03, subd. 6, with the purpose of affording immunity to judgments government actors make in the context of policymaking. *Watson ex rel. Hanson v. Metro. Transit Comm'n*, 553 N.W.2d 406, 412 (Minn. 1996). Under this exception, municipalities are immune from lawsuits for "[a]ny claim based upon the performance or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused." Minn. Stat. § 466.03, subd. 6.[11]

---

sign in the same location was not an attack on a policy decision of a coequal branch of government because, while the Minnesota Traffic Engineering Manual stated that traffic engineers had discretion to add warning signs, no engineer actually weighed policy considerations when deciding (actively or passively) not to install the warning sign. *Id.* In other words, in the latter case, because no government policymaker made a decision weighing competing public policy concerns about whether a warning sign was needed for public safety, there was no policy decision of a coequal branch to attack through a tort claim and the claim did not implicate separation of powers.

[11] Thirteen years after *Spanel*, we abolished sovereign immunity for the State. *Nieting v. Blondell*, 235 N.W.2d 597, 603 (Minn. 1975). In response, the Legislature passed the Minnesota Tort Claims Act, Minn. Stat. § 3.736 (2024), which contains provisions providing immunity for the State and its employees performing discretionary functions. *Compare* Minn. Stat. § 466.03, subd. 6, *with* Minn. Stat. § 3.736, subd. 3(b). We interpret these provisions as extending the same immunity to municipalities and the State. *See, e.g.*, *Nusbaum*, 422 N.W.2d at 719. Consequently, in resolving this case we consider our discretionary-function exception precedents under both the Act and the Minnesota Tort Claims Act.

Of course, affording the government immunity from lawsuit and liability "means that persons who suffer injuries as a result of [government] conduct generally have no civil recourse . . . and are left to bear the costs and burdens of their injuries themselves." *Jepsen*, 966 N.W.2d at 482. In eliminating common-law immunity for torts for the State of Minnesota, we explained:

> One of the paramount interests of the members of an organized and civilized society is that they be afforded protection against harm to their persons, properties, and characters. The logical extension of that interest is that, if harm is wrongfully inflicted upon an individual in such a society, he should have an opportunity to obtain a reasonable and adequate remedy against the wrongdoer, either to undo the harm inflicted or to provide compensation therefor.

*Nieting v. Blondell*, 235 N.W.2d 597, 602–03 (Minn. 1975). To properly serve the public interest, a state must provide its people "with adequate remedies for injuries wrongfully inflicted upon them." *Id.* at 603. Accordingly, to balance the important competing interests in protecting legislative and executive branch prerogatives in making public policy and providing relief to Minnesotans who have been harmed through the fault of a third-party (here, a municipality), we have interpreted the discretionary-function exception narrowly. *Holmquist v. State*, 425 N.W.2d 230, 231 (Minn. 1988).

We have observed that "almost every act involves some measure of discretion, and yet undoubtedly not every act of government is entitled to discretionary immunity." *Cairl v. State*, 323 N.W.2d 20, 23 (Minn. 1982). Thus, we have cautioned that the discretionary-function exception does not immunize a government entity from liability for its conduct simply because a government actor exercises discretion. Rather, discretion for purposes of the discretionary-function exception under section 466.03, subdivision 6, refers

15

specifically to the exercise of judgment used in the context of *policymaking*. *Watson*, 553 N.W.2d at 412.[12]

If there is a single consistent thread in our jurisprudence on the discretionary-function exception to municipal tort liability, it is this: "The critical inquiry is whether the conduct involved a balancing of policy objectives." *Steinke v. City of Andover*, 525 N.W.2d 173, 175 (Minn. 1994). And this makes sense if one returns to the reason for the discretionary-function exception, which is to respect the policymaking function of the legislative and executive branches. *Holmquist*, 425 N.W.2d at 231 ("[I]n determining whether particular conduct is protected, we have interpreted the discretionary function exception narrowly and have focused on the purpose underlying the exception.").

---

[12]   It is worth contrasting the scope and purpose of the discretionary-function exception with the scope and purpose of the distinct common-law doctrine of official immunity, a doctrine that is not at issue in this appeal. Unlike the discretionary-function exception, which provides immunity to *government entities*, official immunity protects *individual government actors* against personal liability for actions taken while performing their duties. *Jepsen*, 966 N.W.2d at 482, 488. While "both doctrines are phrased in terms of whether discretion was involved . . . they are based on entirely different rationales." *Elwood v. County of Rice*, 423 N.W.2d 671, 678 (Minn. 1988). As discussed above, the statutory discretionary-function exception is based on separation of powers concerns about judicial interference with the type of policymaking better left to the legislative and executive branches. *Id.* The concern underlying official immunity, however, is that the fear of personal liability will deter individual public employees from effectively performing duties or engaging in independent action. *Id.* Accordingly, official immunity provides immunity for individual government actors' exercise of independent judgment unless the individual government actor intentionally performs a wrongful act without legal justification or excuse or willfully violates a known right of the plaintiff. Official immunity, then, covers a broader array of "discretionary" acts than the discretionary-function exception, which protects a government entity not from liability for harm caused by exercising *any* independent judgment, but only harm caused by independent judgment exercised *in the context of policymaking*. *Id.* at 677–78.

16

To assist courts in conducting that critical inquiry, we have identified analytical tools that include asking whether a decision is a planning-level decision (which is a public policy decision shielded from tort liability) or an operational decision (which is subject to tort liability):

> Planning level decisions are those involving questions of public policy, that is, the evaluation of factors such as the financial, political, economic, and social effects of a given plan or policy. In simpler terms, planning level decisions require the balancing of policy objectives.
>
> Conversely, operational level decisions involve decisions relating to the ordinary day-to-day operations of the government. Decisions are operational, even when they involve professional judgment or the application of scientific and technical skills in carrying out established policy, as long as the decision does not involve a balancing of objectives in setting a policy.

*Jepsen*, 966 N.W.2d at 488–89 (citations omitted) (internal quotation marks omitted).

This distinction between planning-level and operational decisions is an attempt to capture the key target of the discretionary-function exception: the kind of policymaking conducted by legislators and executive branch officials at the state and municipal levels. The distinction cannot be applied mechanically. We have cautioned courts to avoid "the temptation to engage in a mere labeling approach" in making that determination in a particular case. *Holmquist*, 425 N.W.2d at 232. And we have recognized that determining whether a particular government decision is a planning decision involving balancing broad financial, political, economic, and social consequences, as opposed to an operational-level decision carrying out an established policy, is not a simple task. *Cairl*, 323 N.W.2d at 23 (observing that determining whether an act of government involves the exercise of discretion "has been subject to enigmatic application and occasional breakdown");

17

*Nusbaum*, 422 N.W.2d at 718–19 ("Courts have consistently encountered difficulty in applying the discretionary function exception."). Accordingly, we have "used this distinction . . . only as a means to focus on the central inquiry: whether the challenged government conduct involves a balancing of policy considerations." *Rico v. State*, 472 N.W.2d 100, 104 (Minn. 1991).

Nonetheless, important guidance may be gleaned from our articulation of the differences between discretionary actions that are immune from liability under section 466.03, subdivision 6, and those that are not. The central concern the Legislature had in mind when it enacted section 466.03, subdivision 6, was protecting policy decisions of the type a state or municipal legislative body or an executive actor may make. Stated differently, "[p]lanning level decisions are those involving . . . the evaluation of factors such as the financial, political, economic, and social effects of a *given plan or policy*." *Holmquist*, 425 N.W.2d at 232 (emphasis added). Municipalities are generally not immune from litigation and liability for torts committed in the day-to-day operations of government where the conduct underlying the tort claim conflicts with the policy the government entity adopted through a process of weighing competing social, economic, political, and financial considerations. *Jepsen*, 966 N.W.2d at 488–89; *Terwilliger v. Hennepin County*, 561 N.W.2d 909, 912 (Minn. 1997) (observing that "the legislature did not intend the discretionary function exception to swallow the general rule of allowing recovery for those injuries negligently inflicted in the performance of government operations").

In summary, we start from the presumption that a municipality is liable for its tortious acts. We make an exception to that rule if the conduct demanded by the tort

claimant in the lawsuit—the conduct the tort claimant asserts should have been done—is different than that which the legislative or executive branch has deemed appropriate for a particular situation after weighing competing social, economic, political, and financial policy considerations. In such circumstances, i.e., in the case of a planning-level decision, the separation of powers concerns underlying the discretionary-function exception are implicated and the discretionary-function exception applies. On the other hand, if the government conduct demanded by the tort claimant does not conflict with a legislative or executive branch policy about the appropriate conduct in a particular situation—for instance, because no policy position based on weighing competing policy considerations about appropriate conduct in a particular situation has been adopted or because the challenged conduct violates a policy decision the legislative or executive branch made— then the implicated decision is operational and the discretionary-function exception does not apply.

We emphasize one further point about our discretionary-function exception jurisprudence: The analysis of whether the discretionary-function exception applies must start with identifying the precise government conduct being challenged in a tort claim. *Gleason v. Metro. Council Transit Operations* (*Gleason II*), 582 N.W.2d 216, 219 (Minn. 1998). We simply cannot determine whether the conduct underlying a tort claim is inconsistent with the conduct a policy adopted by the government mandates unless we know what that conduct is. Application of the discretionary-function exception is contextual and circumstances-specific.

19

B.

With this background in mind, we address whether a "hiring decision" is categorically and necessarily a policy-level decision involving weighing competing economic, social, political, and financial considerations for purposes of the discretionary-function exception to municipal tort liability under Minnesota Statutes section 466.03, subdivision 6.

We begin by recognizing that an important implication of the language and structure of sections 466.02 and 466.03 of the Act,[13] as well as our discretionary-function exception jurisprudence, is that in every case a municipality bears the burden of proving that it is entitled to invoke the protections of the discretionary-function exception. *Nusbaum*, 422 N.W.2d at 722 n.6. And because the discretionary-function exception applies only when a tort claimant is demanding that the municipality act in a way that conflicts with the municipality's considered policy decision, the municipality bears the specific burden of proving that the challenged conduct is the subject of the type of legislative or executive branch policymaking protected by the discretionary-function exception—conduct involving balancing competing social, political, economic, or financial considerations. This follows from several principles: (1) the presumption in every case that the government

---

[13]     Section 466.02 of the Act provides that the default rule is that a municipality is subject to liability, subject only to exceptions: "Subject to the limitations of sections 466.01 to 466.15, every municipality is subject to liability for its torts and those of its officers, employees and agents acting within the scope of their employment or duties whether arising out of a governmental or proprietary function." *Id.* Section 466.03 then sets forth the exceptions under which "[s]ection 466.02 does not apply." Minn. Stat. § 466.03, subd. 1.

is liable for its tortious conduct, *id.* at 718 ("[T]he general rule is now liability (if it is established under general tort principles) with limited exceptions of immunity such as where the alleged tortious conduct constitutes a discretionary function."); (2) exceptions are interpreted narrowly so as to not to preclude an injured Minnesotan from recovering for injuries caused by a municipality's tortious conduct unless *necessary* to avoid judicial branch interference with policymaking activities best left to the legislative or executive branch;[14] and (3) our recognition that many government decisions do not involve weighing competing policy considerations.[15]

We have also recognized that the showing sufficient for a municipality to meet its burden may vary depending on the specific tortious conduct the plaintiff alleges and the nature of, and circumstances surrounding, the decision the municipality identifies as governing the conduct at issue. *Nusbaum*, 422 N.W.2d at 722 n.6 (noting that there "may be cases" where "it may be unnecessary for the [government] to produce evidence of how the decision precipitating the challenged conduct was made"). Generally, a municipality must "produce evidence its conduct was of a policy-making nature involving social, political, or economic considerations, rather than merely professional or scientific judgments." *Steinke*, 525 N.W.2d at 175; *Angell v. Hennepin County Reg'l Rail Auth.*, 578 N.W.2d 343, 347 (Minn. 1998) (concluding municipality was not immune from liability

---

[14]  In *Holmquist*, we explained that the discretionary-function exception be interpreted no more broadly than necessary to serve the separation of powers concerns underlying the exception. 425 N.W.2d at 231.

[15]  In *Terwilliger*, we observed that "the legislature did not intend the discretionary function exception to swallow the general rule." 561 N.W.2d at 912.

21

where the record was "completely devoid of any evidence establishing that [its conduct at issue in the lawsuit] was based on policy decisions involving economic, political, and social factors"). This means that the municipality must produce evidence of "how it made the decision for which it claims immunity." *Conlin v. City of Saint Paul*, 605 N.W.2d 396, 402 (Minn. 2000). Broad, conclusory assertions that it based its decision on economic, social, political, and financial factors are insufficient. *Id.* at 402–03.

In a narrow range of situations, we have determined that the nature of, or circumstances surrounding, municipal conduct or a municipal decision may be such that a court may reasonably infer (in the absence of actual evidence about the decision-making process) that the government actor weighed competing policy considerations in engaging in the conduct or adopting a policy. *See, e.g.*, *Watson*, 553 N.W.2d at 413 (stating that transit commission's "decisions with regard to the training of its drivers constitute planning level conduct, protected by statutory immunity" because "in providing training for its bus drivers, the MTC must balance the needs of the drivers, the MTC, and its passengers, and must take into account the resources available to pay for such training"); *Silver v. City of Minneapolis*, 170 N.W.2d 206, 209 (Minn. 1969) ("We think it is enough to say that here, in the light of rumored impending riots, the city had the right to decide how most effectively to deploy its police and fire manpower . . . . Choice of the use of police and fire manpower involves the use of discretion and falls squarely within the statutory exception from liability expressed in subd. 6 of [§] 466.03.").

We have made such an inferential leap in circumstances where, in other contexts, we would take judicial notice of a fact or we would apply a concept like res ipsa loquitur—

where there is an understandable reason for the lack of direct evidence and the connection between the other evidence and the inferred fact are so compelling that a court allows a jury to make an inference that a fact exists in the absence of direct proof. *See generally* Cornelius J. Peck, *The Federal Tort Claims Act—A Proposed Construction of the Discretionary Function Exception*, 31 Wash. L. Rev. & State Bar J. 207, 227 (1956) (cited in *Nusbaum*, 422 N.W.2d at 722 n.6, to support the possibility that there may be cases where "it may be unnecessary for the state to produce evidence of how the decision precipitating the challenged conduct was made").

For instance, it may be fair to make a reasonable inference that a national set of traffic safety standards developed by an expert body and adopted by a state department of transportation was the result of weighing competing social, economic, political, and financial considerations even if in the absence of evidence that expressly so stated. *See Stevenson v. State Dep't of Transp.*, 619 P.2d 247, 255 (Or. 1980) (the example cited in *Nusbaum*, 422 N.W.2d at 722 n.6, to support the possibility that there may be cases "where it may be unnecessary for the state to produce evidence of how the decision precipitating the challenged conduct was made"). Similarly, in an early discretionary-function exception case, we seemingly took judicial notice that a municipality's decision about "how most effectively to deploy its police and fire manpower so as to control . . . riots to the best of its ability if they did break out, and to furnish protection to as many citizens as its

23

manpower would permit" was a policymaking function within the scope of the discretionary-function exemption.[16] *Silver*, 170 N.W.2d at 209.[17]

In *Watson ex rel. Hanson v. Metropolitan Transit Commission*, we considered a lawsuit brought by a bus passenger thrown out the window of a moving bus by a group of teenagers. 553 N.W.2d at 410–11. The passenger claimed, among other things, that the public transit authority which operated the bus system failed to properly train its bus drivers on how to deal with difficult people. *Id.* at 411. The public transit authority sought to dismiss the claim under the discretionary-function exception. *Id.* at 409–10.

The acting chief of the transit authority testified about the limitations on transit authority resources and described processes to ensure safety on buses, including determining the locations of limited security personnel based on weighing a variety of factors, for example, officer availability and the potential for a violent situation on a particular bus. *Id.* at 412. He also testified that the transit authority did provide training to its bus drivers on how to deal with difficult people, though the opinion does not cite any specific evidence about the process the transit authority undertook in deciding the specific training to provide bus drivers. *Id.* We observed that the transit authority faced balancing

---

[16]    Our section 466.03, subdivision 6, jurisprudence has become more developed and nuanced in the nearly six decades since we decided *Silver* and other early cases. In particular, we have made the important distinction between policy decisions based on balancing competing social, political, economic, and financial considerations and operational-level decisions. *See Jepsen*, 966 N.W.2d at 488–89.

[17]    Notably, that decision was framed (as it must be) by the nature of the specific tort claim made against the municipality—that the police should have decided to give priority to protecting residents who notified the police that they were afraid of rioters. *Silver*, 170 N.W.2d at 207, 209.

24

driver, passenger, and authority needs and had to make choices to address these areas and maximize its resources when providing driver training. *Id.* at 413. *Based on these circumstances*, we concluded that it was reasonable to infer that the transit authority weighed economic, social, political, and financial considerations in making that choice of what training to provide in that case. *Id.*

A few further observations are in order regarding the burden placed on municipalities to establish that the discretionary-function exception to municipal tort liability applies. First, the level of generality at which municipal conduct or a municipal decision is considered is important to the analysis. We have not applied an inference that government conduct is the result of balancing competing economic, social, political, and financial considerations to extremely broad categories of government activities. For instance, in another early discretionary-function exception case, *Anderson v. City of Minneapolis*, 178 N.W.2d 215, 217 (Minn. 1970), we appeared to take judicial notice that a municipal permitting decision involved policymaking where the meaning of a zoning ordinance was doubtful. But we have also made clear that *Anderson* did not establish a broad and sweeping rule that a municipality can never be liable in tort for cases fitting within the category of "municipal permitting decisions." *See Snyder v. City of Minneapolis*, 441 N.W.2d 781, 786–87 (Minn. 1989). In *Snyder*, we clarified that a municipality was subject to liability in tort for harm a building owner suffered when the municipality issued a permit that the city zoning code prohibited. *Id.* at 787. We observed that "[e]ach case . . . must be judged in a fashion which focuses on whether the legislature

25

intended to immunize the particular government function which has given rise to the tort action." *Id.*

Second and critical here, we have never held that the broad category of "hiring decisions" is always the result of weighing competing economic, social, political, and financial considerations rather than a day-to-day operation decision. *Cf. Tonelli v. United States*, 60 F.3d 492, 496 (8th Cir. 1995) (holding that the federal government is immune from negligent hiring claims under the Federal Tort Claims Act). We conclude that such a broad, categorical approach is improper.

This type of blanket rule runs counter to our repeated caution that the discretionary-function exception is construed narrowly to avoid precluding Minnesotans from recovering for injuries caused by municipalities' tortious conduct unless necessary to avoid judicial branch interference with policymaking activities best left to the legislative or executive branch.[18] *See, e.g., Angell*, 578 N.W.2d at 346; *Holmquist*, 425 N.W.2d at 231.

A broad rule of immunity for hiring decisions approaches the "mere labeling approach" that we have rejected in determining whether the discretionary-function exception applies in a particular case. *Holmquist*, 425 N.W.2d at 232. We also recognize

---

[18] Best Academy points us to federal cases and cases from other states that, according to Best Academy, adopt the rule it is urging us to adopt. We are not convinced that all the foreign-jurisdiction cases support this position. Moreover, we reemphasize that our discretionary-function exception jurisprudence, and Minnesota law generally, places significant emphasis on balancing the right of injured persons to obtain relief and remedy from those responsible for harm against other important interests, including the importance of courts affording due respect to the functions of coequal branches of government. *See Jepsen*, 966 N.W.2d at 488. Thus, we keep our primary focus on Minnesota cases interpreting section 466.03, subdivision 6.

that potential problems affecting or flowing from hiring decisions are manifold. Indeed, it is precisely because the government conduct challenged in tort claims—including hiring decisions—is so varied that we have insisted that determining whether the discretionary-function exception applies must begin with identifying the precise government conduct challenged in the underlying tort claim. *Gleason II*, 582 N.W.2d at 219. The conduct at issue in one hiring claim will be different from the conduct underlying a different hiring claim—and the hiring protocols and practices will also vary. Once again, the key question is whether the conduct a tort claimant demands is inconsistent with the conduct required under a policy the government adopted after weighing competing policy considerations. *See Schroeder v. St. Louis County*, 708 N.W.2d 497, 506 (Minn. 2006) (determining that where county employee "was acting according to an established policy of the county" that allowed for employees to "exercise[e] individual professional judgment" and use "discretion to decide, in the field," how to perform their duties, the employee "[wa]s protected by official immunity"). This is a circumstances-specific inquiry.

We do not see a reason to announce by judicial fiat that all hiring decisions are, by their very nature, the result of weighing competing economic, political, social, or financial policy considerations. Experience tells us that there are times municipalities, like other organizations, adopt or abandon certain hiring practices out of personal preference or inertia. In addition, there are times municipalities have not anticipated particular hiring situations and have proceeded from expedience or exigency without taking time to deliberate. A comparison to our permitting decisions is apt: In some cases, a "permitting

27

decision" involves weighing competing policy factors and in some cases it does not. *Compare Anderson*, 178 N.W.2d at 216, *with Snyder*, 441 N.W.2d at 787.

Our decision in *Rico* is not contrary to this conclusion. In *Rico*, a former Assistant to the Commissioner of the Minnesota Department of Veterans Affairs, sued the State and the Veterans Affairs Commissioner for wrongful retaliatory discharge after he was removed from his unclassified policymaking position. 472 N.W.2d at 102. As an Assistant to the Commissioner, Rico had department-wide responsibility for policy development and implementation and engaged in related budget and legislative activities. *Id.* at 103, 105. By statutory definition, Rico was part of the "agency management team," had "significant discretion and substantial involvement in the development, interpretation, and implementation of agency policy," and was "accountable to, loyal to, and compatible with the governor and the agency head." *Id.* at 105 n.2 (citing Minn. Stat. § 43A.08, subd. 1a (2024) (defining "unclassified service")).

The primary consideration in *Rico* was whether the policy interest in discouraging retaliation in employment precludes protection under the discretionary-function exception. *Id.* at 106. We observed that Rico *conceded* "that the decision to remove [him] involve[d] a balancing of policy considerations" and based his argument that the discretionary-function exception did not apply on other unrelated reasons. *Id.*

That said, to the extent our decision in *Rico* turned on the question of whether the decision to remove Rico involved weighing competing policy concerns, we focused on the fact that the nature of the position required him to engage in policy development. *Id.* at 105. And the State introduced evidence that Rico did, in fact, engage in policymaking. *Id.*

28

at 103.  The State explained that it removed Rico due to "on-going problems of [his] personality, his interpersonal relationships with other employees, members of our veterans constituency, threats and allegations, [which] were not consistent with the type of department we wanted to run" and that he had "burned most of his bridges in state employment."  *Id.*  On this evidence, we stated:

> The decision to fire an unclassified member of a commissioner's management team demands policy considerations[.] . . .  The governor establishes policy through the commissioners and through the unclassified employees who are part of the management team.  The authority to choose the top leaders in the administration—and accordingly also to remove them—is essential to effectuate the governor's public policy goals.  Consequently, the job security of these high-level government officials traditionally has been subject to the ebb and flow of political tides and public opinion . . . .  The governor and the commissioners pursue their policy goals when making decisions about who to hire and who to retain in the administration's management team.

*Id.* at 105–06.

In *Rico*, then, although there was no evidence that the specific decision to fire Rico involved weighing policy considerations, we concluded that the discretionary-function exception protected a decision to fire a person like Rico whose job (as demonstrated by the evidence) plainly involved developing the type of policy protected by the discretionary-function exception—the balancing of competing social, economic, political, and financial considerations.  *Id.*  Based on the testimony that Rico was engaged in developing public policy and was removed from his position due to his inability to work with others who were integral to formulating and implementing such public policy, we concluded that the discretionary-function exception prevented a tort claim challenging his firing.  *Id.* at 103, 106.

That is not to say that a decision to hire or fire an employee never involves balancing competing social, economic, political, and financial considerations that are protected by the discretionary-function exception. Rather, it is to say that in *Rico* we did not announce a broad rule of law that every time a government employee is hired or fired it involves balancing competing social, economic, political, or financial considerations. That question must be answered on a case-by-case basis, considering the nature, context, and duties of the position.

Moreover, we are not convinced that every decision to hire or fire a teacher involves policymaking—the balancing of competing social, economic, political, and financial considerations—or that every teacher is engaged in policymaking such that a decision to hire or fire a teacher is necessarily protected by the discretionary-function exception as in *Rico*. And Best Academy offered no such evidence about Hjermstad's position in this case.[19]

We want to raise one additional concern about the rule the district court and court of appeals applied. The discretionary-function exception in section 466.03, subdivision 6, does not shield conduct which clearly violates an express policy adopted by a controlling authority from litigation and liability—*even if* that policy was adopted by balancing competing economic, social, political, and financial considerations—because such conduct

---

[19] In granting (and affirming the grant of) summary judgment to Best Academy, the district court and court of appeals relied primarily on two court of appeals decisions: *Gleason I*, 563 N.W.2d at 320, and *Fear*, 634 N.W.2d at 204. Neither of these decisions are binding on us. *State v. Serbus*, 957 N.W.2d 84, 89 (Minn. 2021). To the extent those opinions suggest hiring decisions are necessarily and categorically subject to the discretionary-function exception, they are not good law.

30

cannot be characterized as "discretionary." *Snyder*, 441 N.W.2d at 787 (suggesting that a decision to issue a permit that was explicitly not allowed under a municipal zoning ordinance was not subject to the discretionary-function exception); *Cairl*, 323 N.W.2d at 24; *see also id.* at 27 (Yetka, J., dissenting) ("[T]he doctrine of discretionary immunity does not apply where specific standards of conduct as set forth in statutes, regulations, or court orders are violated."). As discussed in Part II, the record on summary judgment here suggests that may be what occurred in this case. Yet, the categorical rule applied by the district court and the court of appeals that hiring decisions are protected by the discretionary-function exception tends to obscure that sort of nuance from judicial decision making.

In sum for purposes of the discretionary-function exception to municipal tort liability under section 466.03, subdivision 6, in cases where a municipality fails to bring forth evidence to meet its burden of showing that a municipal hiring decision or policy involved balancing competing economic, social, political, and financial considerations, a court may not infer that the hiring decision or policy involved balancing competing economic, social, political, and financial considerations merely because it falls in the broad category labelled "hiring decision."

II.

We now turn to the proper application of the discretionary-function exception to the summary judgment motion here. We begin with Minor Doe's claims that the harm he suffered from Hjermstad would not have occurred had Best Academy, among other things, done a proper review of Hjermstad's background, including, but not limited to, obtaining

31

reference letters and contacting the references that Hjermstad provided. Had it done so, Minor Doe claims, Best Academy would have discovered the allegations of Hjermstad's prior sexual abuse and would not have hired him. Accordingly, one central discretionary-function exception question here is whether Best Academy met its burden of showing that it decided, after balancing competing economic, social, political, and financial factors, that it need not obtain reference letters nor contact Hjermstad's references.

We conclude, based on the record before us on appeal from the granting of summary judgment, that Best Academy did not meet its burden. First, the record provides no evidence about how the hiring practices and protocols that Best Academy used were developed. Under our general rule that a municipality must produce evidence that its conduct was a policy decision involving weighing competing social, political, or economic considerations, Best Academy did not meet its burden at this stage of the proceedings.

We also determine on the summary judgment record that Best Academy failed to demonstrate that its conduct in failing to more thoroughly investigate Hjermstad's background—for example, by not requiring reference letters and not contacting references—was based on weighing competing social, economic, political, and financial considerations.

Best Academy's own hiring process documents suggest that reference letters and contacts *were* necessary. For instance, the application asked for three reference letters. Bump testified that every part of the hiring protocol was mandatory. The record further shows Hjermstad asked whether the letters of reference were really necessary, but there is nothing in the record that Best Academy ever responded to the inquiry. It seems odd that

we would infer on from this set of circumstances (without any evidence) that Best Academy in fact weighed competing policy concerns and decided that reference letters were no longer necessary, then neglected to change its application process and protocols.[20] It would also be unreasonable and inappropriate to infer (in the absence of evidence) that Best Academy weighed competing economic, political, social, or financial considerations if it decided to waive the reference letters requirement for Hjermstad. At the very least, it seems just as likely that a day-to-day operational decision was made to hire Hjermstad without following the otherwise required step of obtaining reference letters.

Similarly, the request-to-hire form Best Academy used in its hiring process included spaces to record calls to an applicant's three references, including the date of the calls. Bump believed that the references would be called. Shana Ford, the Chief of Administration and Human Capital at the Network, stated that there was a period when references would have been contacted, but the practice stopped at some undefined point before Hjermstad was hired. She offered no explanation for why the practice stopped and there is no information in the record that the decision to stop contacting references was deliberate or that the school reached the decision after weighing competing economic,

---

[20]     Of course, if Best Academy's hiring practices and protocols required submitting three reference letters and the school simply failed to follow that process, Minor Doe's argument that the school should have required the three reference letters is not an attack on a policy the school adopted and so does not implicate the separation of powers concerns underlying the discretionary-function exception. Accordingly, the discretionary-function exception would not shield Best Academy for its conduct in failing to obtain three reference letters. *Snyder*, 441 N.W.2d at 787 (noting that conduct that violates a municipality's adopted policy is not protected from tort liability under the discretionary-function exception).

political, social, or financial considerations. Once again, nothing in the record or in the nature of the decision to stop contacting references suggests that it would be reasonable or appropriate for us to infer (in the absence of evidence) that the decision involved weighing competing economic, political, social, or financial considerations.[21]

Accordingly, we conclude that the district court and court of appeals incorrectly determined that Best Academy made a policy decision, following weighing competing economic, social, political, and financial considerations, that the conduct that Minor Doe asserts Best Academy should have undertaken—additional inquiries into Hjermstad's background—was unnecessary. Although questions remain about whether the failure to take those steps "was negligent and whether it caused [Minor Doe's] injuries, such a claim is not precluded at the outset under the discretionary function exception." *Nusbaum*, 422 N.W.2d at 723.

Finally, Best Academy makes two arguments that, notwithstanding our conclusion above, we should nonetheless hold that the discretionary-function exception to municipal tort liability applies to shield it from Minor Doe's claims.

---

[21] Minor Doe also observes that Best Academy did not require Hjermstad to provide a complete application. Hjermstad's application left two items blank: He did not provide a reason he left his prior employment at Excell and he did not grant permission for Best Academy to contact Excell. On the other hand, the record shows that Hjermstad told Bump that he left Excell due to staff reductions, and there is evidence that Best Academy generally did not contact former employers. Minor Doe also claims that the hiring process was rushed and that Best Academy conducted the hiring process out of order by interviewing Hjermstad, then offering him the job, then providing him a job application to fill out. We leave determining the proper scope of the conduct on which Minor Doe may rely in making his negligent hiring claim to the district court on remand.

34

First, Best Academy focuses on Bump's role in the hiring process, arguing that the record demonstrates Bump weighed economic, social, political, or financial considerations in deciding to hire Hjermstad. In her deposition testimony, Bump explained that she chose Hjermstad to fill the open physical education position because he had spent a significant amount of time in North Minneapolis and its northern suburbs as a teacher, had a long history of volunteering and coaching, and had charter school experience, including experience as a charter school board member.

To the extent Bump's considerations constitute weighing economic, political, and social considerations as opposed to an exercise of professional judgment—an issue we do not decide—Bump's testimony is not relevant to Minor Doe's claim in this case. One thing glaringly absent from Bump's deposition testimony about her decision is any suggestion that she would have been willing to hire Hjermstad had she known he had sexually abused, or was accused of sexually abusing, a child in his prior position. The conduct Minor Doe is challenging is not Bump's decision based on the facts she had; it is Best Academy's conduct in failing to take steps that would have revealed the information about Hjermstad's prior sexual abuse. Thus, in assessing whether the discretionary-function exception applies here, we will not focus on Principal Bump's decision-making. *Gleason II*, 582 N.W.2d at 219 (stating that the discretionary-function exception analysis must start by identifying the precise government conduct being challenged in the underlying tort claim); *Nusbaum*, 422 N.W.2d at 722–23 (focusing on three discrete acts related to placing signage at the terminus of a speed zone).

Second, Best Academy argues that it cannot be held responsible for failing to obtain information under a hiring policy because it made an independent policy decision to contract out some of the steps in the hiring process—including contacting references and gathering application materials—to the Network, a separate entity. We do not agree.

Best Academy cites no authority for its argument. More to the point, Best Academy hired Hjermstad to work for Mastery. He sexually abused Minor Doe while an employee of Mastery. The Network was operating as an agent of Mastery when it assisted in the process of hiring Hjermstad. Section 466.02 expressly states that "every municipality is subject to liability for its torts and those of its officers, employees and *agents* acting within the scope of their employment or duties whether arising out of a governmental or proprietary function." Minn. Stat. § 466.02 (emphasis added). Because there is no factual dispute that Network was Mastery's agent, Best Academy's argument fails.

## CONCLUSION

We reverse the decision of the court of appeals and remand this case to the district court for proceedings consistent with this opinion.

Reversed and remanded.


HENNESY and GAÏTAS, JJ., not having been members of this court at the time of submission, took no part in the consideration or decision of this case.

36